Cases 23-3214, et al. United States of America v. Joel Sorto, appellants. Ms. Biderman, for the appellants, District Court's failure to hold a hearing and ineffective assistance of counsel regarding Spanish tapes. Ms. Fernandez, for the appellants, ineffective assistance of counsel for failure to pursue entrapment and selective enforcement. Good morning, Judges Wilkins, Rau, and Walker. I'm Donna Biderman. I'm here on, arguing on behalf of all three of the appellants on the issues of the fact that there was not a hearing upon remand on the Spanish language tapes. Ms. Fernandez will then argue on the issue of entrapment and on selective enforcement. In 2017, this court sent this case back to the District Court for a hearing and asked the District Court to answer three questions. The District Court did not hold a hearing. The three attorneys filed affidavits. That's the only additional evidence in this case at all. And the District Court did not hold the hearing and denied it. Those three questions that were sent back to the District Court were not answered because there was no hearing here. So, the first of those questions is why defense counsel failed to pursue entrapment. The second is why they did not object to the admission of the Spanish language tapes and what conversations they had with their clients and also whether appellants advised their counsel that the testimony was not an accurate account of the conversations. And the third question is the extent of the prejudice not objecting to the Spanish language tapes. I'm going to take those in reverse order, the first one being the extent of the prejudice from not objecting to the Spanish language tapes. There is nothing at all in the affidavits that addresses this question. And in fact, there couldn't be anything in the affidavits that addresses this question. Therefore, that question wasn't even addressed at the District Court upon remand. Well, what if you had had a hearing, what would you have put in evidence about prejudice? What we would have put into evidence about prejudice is that the entire case was changed because of the Spanish language tapes. That there was enough evidence to show that the defendants had shown up, the appellants had shown up with guns, but there wasn't enough evidence without the tapes to show that they had conspired to commit the robbery. That sounds like argument, not evidence. That is partially argument and partially evidence because it changed the whole way that the status of the case was. What's the new evidence in the answer you just gave? The way that the case would have been presented to the jury, what the jury would have heard would have been new evidence there. I don't follow that. I mean, that's an argument. That is an argument about how the trial would have been different, but you don't put on a witness to testify about how the trial would have been. That is partially an argument and partially it would have come out at the hearing as to how the case was different. There wasn't enough evidence on that in the argument that was put on yet. The second one is that- What witness would you call? Is that new evidence? I think that the defendants themselves would have been able to testify as to some of that. Were they able to file affidavits? They were able to file affidavits, but the court remanded for a hearing. Trying to figure out what would have happened at the hearing that couldn't have happened in the affidavits. Well, as to the Spanish language tapes by themselves or as to everything, because there is more that would have happened that they would have put on evidence. First of all, I haven't gotten to the other two questions yet. One of the questions was why the defense counsel failed to pursue entrapment. The counsel put in affidavits. The defendants didn't have a chance to testify as to what happened there. They didn't have a chance to testify as to- was because their clients didn't want them to. As a matter of fact- It seems like that goes to deficiency, not prejudice. No. What goes to deficiency, not prejudice? Your client's possibility that your clients could have rebutted the attorney's reasons for not pursuing an entrapment. Goes to sufficiency of the evidence. Would have gone to whether counsel was deficient. Correct. It would have gone to- But it doesn't seem like it would go to whether any deficiency was prejudicial. I think it would have gone to both because it would have shown how they could have gone forward without it. What the trial would have looked like without it. I would like to- What could they have said? They would have said that they did not tell their counsel not to pursue this, that they wanted to go forward with the strategy, and that they wanted to pursue the entrapment. Now, I will like to point out that Mr. Lovo, Mr. Sorto's attorneys did say it was because of the client's preferences. Mr. Asciutto's attorney didn't even address this question in his affidavit. There's nothing on the record at all from Mr. Asciutto's attorney. I think where you need to try to go here is the government says we can concede that counsel first part of strictness. Even assuming that they were deficient, you have the burden of showing that there's a reasonable probability of a difference in the outcome, the prejudice. Correct. So, whether the lawyers would have testified about why they did or didn't pursue it or whatever, kind of beside the point here because we're presuming that they were deficient, that that was a mistake. We're just going to presume that that was below the standard performance. So, talk to me about prejudice. Well, Your Honor, as I said, the entire trial would have been different without these tapes because what they did is the government showed tapes from four different days and what they did is they showed part of the tape, they paused it, they then asked questions, the government's witnesses then said, this is what we're all saying here, and then they started it again and then they paused it and then that went on and on and on throughout the trial. I understand that the trial would have looked different, it would have proceeded differently, but presumably then they would have just, without the tapes, would have just testified, this is what we said on this day at this time and this is what happened and what was said by everyone. And because the defendants, their statements are admissible as admissions by a party opponent, the government witnesses don't need the tapes to testify about what they say the defendant said. So, wouldn't all of the substance of the conversations, at least according to the government, wouldn't have that come in any way? It bolstered their credibility by showing these tapes that nobody could understand what was going on, that we didn't have transcripts for that were in Spanish, that were inaudible. The professionals that tried to take it down wrote they couldn't even figure out what was happening on them because they couldn't write it down into the transcript, which is part of the problem. Isn't the reasonable inference from that that the jury didn't really credit the tapes for anything? For one, they probably couldn't understand most of it that was in Spanish, and two, if the tapes were so bad, then how could they bolster credibility because the jury would have been like, I don't see how this corroborates them because no one can understand what's on these tapes. Because they were showing what was going on, and then the government was saying, oh, this is what's happening here. And then they would show the next part and the government would say, oh, this is what's happening here. And there wasn't a meaningful way to combat that or to argue against that because there was no transcript of the Spanish language tapes and they were inaudible. And the other thing I would like to point out is that had there been an objection to it, when it came up in 2017 and this court found that it was error to have these tapes there, it would have been found under a different standard. This court found that there was error, but that it didn't raise to the, that they couldn't find on the record that it raised to the level of plain error because there wasn't enough about prejudice on the record at that point, and that's why it remanded for a hearing. If it had gone up... Are you contending that to the extent that the tapes were videotapes and had audio, and that the audio part couldn't have been admitted, are you saying then that the video could have been excluded also? I'm saying that is an argument that the defense attorneys could have made. I don't know which... We didn't find that in our first... Correct. And you didn't make that argument as best as I can recall in the first review. I'm not you, but the defense did. Right. They didn't make an argument at all. The trial defense counsel didn't make an argument at all to exclude them. Even if the trial had proceeded properly, then there would have been video and no audio, right? There could have been. It's possible. They would have proceeded in the same way, but saying, this is what happened here, and this is what we were doing. This is what we were saying. It would not have been bolstered by the audio, but it could have been bolstered by the video, right? There's parts of it were videos, parts of it was just audio, and it's impossible to separate out which part of it was prejudiced by which. But my point there was that if the defense counsel had objected to it at the trial court, there's two things that would have happened. Either the trial court would have kept them out and they wouldn't have been there, or the trial court would not have kept them out. And when it was appealed and came up to the court of appeals, to this court, it would not have been under the plain error standard. It would have been under the harmless error standard. So the fact that they did not object to it is itself raised the level of prejudice that they needed to show and the level of error. Do you have any authority for that proposition? That seems to be a proposition that that's ineffective assistance. I mean, we hear plain error cases every day on appeal. Yes. And it doesn't get turned into ineffective assistance because they failed to object and we are under a plain error standard instead of a harmless error standard. It seems like that just throws a monkey wrench into how we review criminal convictions. I don't think it does because this court has found that there's error, right? So the question is, what is the standard of review that you and the level of review that you need to put on there? So in every case where there's a failure to object and we review in a criminal conviction under plain error, that's also the basis for an ineffective assistance claim. No, but in every case where you send the case back to the district court and say, tell us about the prejudice, then that can be a significant issue as to... How does the district court want to assess the prejudice from a failure to object on appeal? That's not what they're assessing. They're supposed to assess the difference in the outcome of the trial. Correct. It's not a failure to object on appeal. It's a failure to object at the district court. And the standard would have been different when it came up to this court. And when it came up to this court, the court would have overturned it at that point because of that error that the court found. Given the time, why don't you move on beyond the tapes to... I think you want to address another issue. The other issue was the fact that they didn't hold the hearing. So at this point, I will secede the rest of the time to Ms. Hernandez because I think we covered that unless you have any other questions about our argument. All right. Thank you. Good morning, Ms. Hernandez. Good morning, Your Honors. So a little bit of background. I represented Mr. Lova for sentencing below because all three defendants fired their lawyers after they went to trial and lost. And I appeared before this court for the first appeal. Deficiency. My client was a young man, and then this goes to entrapment. My client was a young man working more than 40 hours a week. He lived in D.C. with the mother of his child and the mother-in-law. He worked in Baltimore County, more than an hour away, generally more than 40 hours a week. I obtained his work records for purposes of sentencing. The trial lawyer did not have that. We don't need to argue deficiency. As I said to your colleague, the government is conceding that for the purposes of this argument. So focus on prejudice. Well, the prejudice, you don't need prejudice for entrapment in this sense. You can be guilty and still be entrapped. That is, you can admit that, in fact, entrapment essentially says, I didn't need to show a reasonable probability that the entrapment defense would have succeeded. Well, that's my point. First of all, his lawyer, his trial, I'm sorry, your honor. I think that's what Judge Wilkins was saying. Okay, so his trial lawyer issues an affidavit, sends an affidavit to Judge Cooper and says it was a strategic decision. He can't make a strategic decision when he hasn't obtained his work records from a reputable company. That's deficient. That's deficiency. That's deficiency, and that also undermines his argument that it was a strategic decision. You cannot. Deficiency too, what's the On an entrapment defense, what is the reasonable probability that it would have succeeded? It meets all the requirements for entrapment, and it's a jury issue. How does what meet all the requirements for entrapment? He was induced by his friend for over a year to buy drugs. When that didn't pan out, they then brought in this supposed reverse sting robbery. Two, they said it's an easy thing because we have an inside job. Three, the friend called him 131 times, which was an out-of-the-ordinary event. He called him 131 times about the heist? He called him 131 times when the phone records reflected. Your answer is we don't know. Right, but that goes to a jury. You didn't proffer any evidence, as best as I can tell, but correct me if I'm wrong, of what was the content of any of those 131 calls. There's an inference to be drawn when the phone records show. Yes or no about whether you proffered any evidence about the contents of the call. Only the inference, your honor, which the government produced. That's the government's cases every day, right? The inference to be drawn from the fact that the friend called him 131 times in the two months before the robbery was to take place, when normally he wouldn't make those calls. I think, let's concede that the very first moment, the first two words out of the officer's mouth or the friend's mouth, that alone right there would not have been enough for entrapment. The first two words out of their mouth, right? I don't understand what you mean. Presumably, you think there was entrapment and that entrapment occurred at a certain point in this story. The entrapment- Went from being non-inducing to inducing, went from being non-entrapment to entrapment. I think it was entrapment from day one. They used a friend, a close friend- What was the first, what happened on day one that made it- On day one, when they purchased the second small quantity of drugs and decided this isn't going to play out as a federal drug case, so we're going to go through this reverse sting, the defendant testifies at trial that the officer told him, the undercover officer tells him that maybe we can give you a job, a construction job, because we're trying to fix this office and blah, blah, blah. The officer on the stand says, doesn't say it didn't happen, says, I don't recall- Okay, but let's take that. Let's say it happened. Okay. Right there, what you just said, that satisfies all the elements of a successful entrapment. At what point in the narrative were all the elements of a successful entrapment defense set? Entrapment requires inducement. I don't need the rule explanation. I need the rule application. At what point in the facts of this case did the conversations with the officer and the friend go finally satisfy all the elements of the entrapment? Well, first of all, that's a jury issue. Was there entrapment? And second of all, I would submit to the court that it is- What point should the jury have found that if you'd gotten to present- When you put everything- At what point in this narrative did it become entrapment? When you put everything together. So at the very end, the last sentence, the last word that was spoken, it wasn't entrapment until then, but at the last word that was spoken, it became an entrapment. I don't understand the court's question or why the court is going there for this reason. As every jury issue, I don't know that I can point to one single fact or event that brings it there, but when you take all the facts- I'm not saying it would have to be that fact by itself, but it would be that fact plus all the facts that came before it. That fact would be the straw that broke the camel's back. That fact would be when the line was crossed from not inducement to inducement. I don't know that this or any other case can point to a point where it goes from non-inducement to- Everything in this case is true. Mr. Lobo was entrapment. Let me put it this way. Let's suppose the instruction had been given, the entrapment instruction had been given, and the evidence that was proffered to the trial court had been introduced. To which trial court, your honor? To the actual trial? Whatever you presented on remand, and whatever you had presented prior to remand relevant to entrapment had been introduced. What is your 60-second closing argument to the jury based on those facts, based on that evidence, that they should find entrapment? I have a young man working more than 40 hours a week, traveling back and forth, supporting his family. No prior convictions for robbery or anything like that. They send his friend for more than a year to try to get him to sell drugs. Minimum, $700. They then tell him, we're going to hire you to do this reconstruction. The messaging always comes from the undercover to my client, and half the time my client is, I'm at work, I'll call you back. There are 131 calls from the friend just before this thing happens, and then he shows up. And I would submit to the court, your honor has been a trial judge. Juries love to hear that the defendant was employed full-time, not by his cousin, not 10 hours a week, with timesheets. His employer for sentencing came in and sent a letter saying, I would hire him, even knowing the conviction. I would rehire him because he was such a good worker. I submit to the court, I have a chance with that jury. I have a chance with at least one juror. And the fact that the trial attorney, who I know and who's a very good trial attorney, did not get his work records, it's not just the defendant saying I worked, right? It's concrete evidence. The fact that he did not get the phone records that showed these inordinate number of phone calls, it's deficient. How can you make a decision whether entrapment's going to play or not if you don't have basic information about a case? The 131 phone calls, those were, if I recall right, from June to August. From June 15th through August 24th of 2013. Those are just the phone calls. That doesn't mean there weren't meetings and everything. I just understood. Did you proffer evidence of how that compared to the frequency of calls prior to June 15th? Yes, the phone records reflected that was an extraordinary number of calls. In other words, if you look at the phone records that we received, he wasn't calling, 131 calls is almost at least one a day. That was not the frequency. And most of the calls were coming from the friend to my client. And my clients at work. Anyway, I'm way over here. I thought of a clearer way to ask the question that I think I probably was inartful in asking. So this is a quote from Glover. The government's behavior amounts to inducement when it was such that a law-abiding citizen's will to obey the law could have been overborn. And I'm wondering if you can tell me at what point was his will overborn? He's a young kid with a lot of, with a very difficult childhood, absent father. The friend knew it. The point when his will was overborn? It was. What point was his will overborn? I don't, I'm sorry that I don't. My view as a trial lawyer, and as well as a human being, is that there's no single point where something happens. It builds. It builds. Maybe just at what point? At the point that he showed up. The point that he showed up. Well, I mean, I'm just saying the whole, the whole form to be overborn. Well, he has no prior convictions, no, no evidence of, of no prior convictions or charges for armed robbery or, or, or violent crime. I mean, I think you would, you can see that someone, someone who had lived the best life imaginable, right? And the government agent says, would you like to do a robbery? Is he induced at that point? No, but this, the friend starts contacting him in July of the first 14 grams of cocaine are July 24th, 2012. This is a close friend of his, who has nothing to do with any of these defendants, who's caught on a drug case of his own and starts, because he's working for the cops, doing this. The other thing is that the government didn't do, which they do in cooperative cases, is that they, they could have taken the friend's phone and, and monitored it. I've had cooperators, the government makes my client sign a document that says, we can monitor your call. So we know what you're talking to. And I'll give you one chance to give you a chance to respond. If your argument is that the. Inducement to break the law began before the government even spoke a single word. That's, that's, that's a hard argument. No, because the government, my argument is the government is speaking throughout from the friend reaches out to my client in July or before July. That's the first time he, he gets him to give him drugs, a small quantity, because he's working for the government. So the government is putting him up to get, get me, get me some snacks. You want to reduce your sentence? You got to bring me somebody. So my argument to the court is that everything that the friend's not reaching out to my client, because he's doing it because he wants to get my client in trouble. He's doing it because he's being told, if you bring me another head, we can give you a reduction. And the friend was out the whole time. And the friend, we never, the jury never heard any of this. The jury never heard any of this. And, you know, the question about when it's induced, you know, Jacobs, the Supreme Court case, Jacobson with the porn and everything else. It's, it's, it's multiple times that happens, multiple events that bring somebody overboard. And, and again, maybe I would never have been, but my kid is just a young man with, you know, limited education, difficult childhood. The fact that he was employed full time, he was here legally. Maybe he's not a perfect human being. And maybe the fact that his friend also, his friend knew all sorts of things about his personal life that would have made him susceptible to some of these entreaties. So it just. You didn't, you didn't proffer testimony about any of that. About the friend, I argued. Oh, you didn't. The counterfactual that we have to assess is what evidence would have been presented of entrapment had that evidence been pursued properly by the lawyers. And then the instruction was given. All the arguments that I'm making were made post verdict. But what I'm saying is, is that what, what you can say at sentencing or to a judge is different than what a jury would be allowed to hear. Well, I made all those arguments in the, in the motion for new trial in the district court. But yes, the client could have testified to some of that. But you didn't proffer that your client was going to testify to any of that. I, I proffered that those were the facts, unrefuted facts about his personal background. Are there in the pre-sentence report? So there's, this is unrefuted facts about his personal background, his father being, being absent, all his difficult difficulties. The fact that this is a young man who's a friend of his for a long time. All those facts were proffered who I would have put on the stand to testify to that. You know, that was not an issue. And the motions, there are multiple people who could testify to such things. His wife could have testified. He could have testified different people in his life. You know, he dropped out of school and all of this, all those things. All right. Well, I think we have.  Yeah. Thank you so much for going on. Okay. I please the court, Timothy Cahill for the United States. The district court's ruling should be affirmed because appellants have failed to show prejudice on any of their ineffectiveness claims and have not identified any evidence outside the record bearing on prejudice that would have required an evidentiary hearing. First, I wanted to clarify and emphasize that the remand order from this court did not express the order, a hearing and following the typical practice of remandering what this court viewed as a colorable ineffectiveness claim. This court was giving the district court in the first instance, the opportunity to do a robust review of the trial evidence and any proffers or additional evidence outside the record that appellants were able to present and then evaluate whether a hearing was necessary. The district court did that in this case. And as we've argued in our briefing and happy to argue here, reached the correct conclusion that no prejudice was shown on the existing record and there was no proffer of any disputed facts that could have affected that prejudice ruling. With respect to the Spanish audio issue. Let me ask you about that. I mean, we said that on this record, we don't know why defense counsel declined to pursue the entrapment defense. Okay, so that goes to deficiency. And then we said the record does not contain sufficient evidence for us to weigh counsel's performance for any resulting prejudice. So if we couldn't weigh it, given the record and we send it back, then how could the district court judge who wasn't the district court judge who tried the case and saw the witnesses and heard the evidence, how was that district court judge in a better position than us to weigh prejudice? We couldn't weigh it. And how could the district court have weighed it without a hearing? So I have two responses to that, Your Honor. The first is in remanding on that basis, this court, I think implicitly, at least recognize the possibility that on remand, additional information could be presented by appellants that would have necessitated a hearing. They were given the opportunity to do that on remand and didn't do it. The second thing I would want to note is that while it's true that the record of the trial has not changed since direct appeal, with respect to the ineffectiveness claims, that was not the focus of, frankly, either party or the court on direct appeal. There were Fourth Amendment and crime of violence issues that comprised in a 70-page brief and a 90-page brief, all but about five pages of those briefs. The ineffectiveness claims were treated in pretty cursory fashion. Are you trying to say that we didn't mean what we said when we wrote that the record does not contain sufficient evidence for us to weigh counsel's performance or any resulting prejudice? But certainly with respect to the prejudice, Your Honor, I think the record presented to this court on direct appeal was maybe not as robustly developed and analyzed and addressed, and that the district court, as is this court's typical practice, the district court is in the best position in the first instance to do that sort of robust review of a fact-intensive issue with the parties exploring the trial record in depth and, again, giving appellants the opportunity to present any evidence they thought was relevant to that issue, but may have been outside the record. And having— The court didn't say that the record, as we have it, or the record that was presented to us, it says the record does not contain sufficient evidence for us to determine prejudice. And, again, we say later in that same paragraph, nor is the extent of resultant prejudice, if any, clear from the record. And we therefore remand for consideration of this challenge as well. That's with respect to the tapes. And we've said that with entrapment, you know, that's a jury issue, the fact-bound issue. So I just find it hard to understand why, if we said record isn't enough, sufficient for us to determine prejudice, how a district court judge looking at the same record can make the assessment. And I would emphasize again, Your Honor, that on remand, this court having done the remand, appellants have the opportunity then to identify any disputed facts that they thought would be necessary for the district court to resolve that would necessitate a hearing. And throughout that process, and frankly, even now on appeal, for two briefs and an oral argument, I would submit that they have failed to identify a single disputed fact that would be determinative on the issue of prejudice. And given that posture, the district court— I'm not sure what you mean by they haven't identified a single disputed fact. They've identified that there were 131 phone calls. They've identified that they would have introduced work records. They would have—I'm going to ask you the same question that I asked defense counsel. So let's suppose all of that evidence came in and the entrapment defense was presented and instruction given to the jury. I don't know whether you ever were a trial lawyer, but what would the government say in its closing as to why the jury should not find entrapment? So I think there's focus on the phone calls, even if we imagine some scenario where those phone logs, which is all that was proffered. And that's why I say there's no disputed fact. There was no proffer about the content of those phone calls. That may have been a disputed fact that would have required resolution. But the mere existence of the phone calls, I think, would not be compelling evidence of entrapment, certainly not enough to raise a reasonable probability of acquittal, given that the contents of them would have remained a pure speculation. And the only evidence we have about them, as Justice Cooper points out correctly in his district court decision, undermines any suggestion that they were part of some campaign, both the length of those calls and the timing of those calls. Almost all of those calls preceded the August 13th meeting, when the idea of a robbery was ever even first proposed to Mr. Lovo. So those phone calls preceded the fact that a robbery could have even been proposed. Secondly, the longest of all of those phone calls, the absolute longest one, was two minutes and seven seconds long. Most of the phone calls were a matter of seconds long. I'm not going to speculate what they were, but that's all that you could—I mean, that might be—I'm running late. I mean, there's not a lot you can say in a few seconds that could overwhelm someone's— overbear someone's will to obey the law. You're going to do the robbery, right? We're on for the robbery, right? You can say that in a few seconds. You could, Your Honor, if anyone had ever proposed a robbery. But the only evidence from either party, including Mr. Lovo's own testimony, is that the robbery wasn't proposed until August 13th. There's no evidence proffered or suggested to the contrary. So how many calls were between August 13th and 24th? I believe—I know that prior to August 13th was about 100 of those calls. And then after August 13th, looks like less than 20 after August 13th. I would also emphasize that according to the only evidence we have about Mr. Avila—that's Mr. Lovo's friend's role in all of this—his role ended when he accompanied Mr. Lovo to that first meeting where the robbery was proposed. At Mr. Lovo's own request, he was left out of any further proceedings. So from the moment the robbery was even on the table, Mr. Avila no longer played any role in these proceedings. And the record evidence is overwhelming that from that moment on, Mr. Lovo's predisposition was that, far from being reluctant to engage in this criminal behavior, when he was multiple times given the opportunity to back out with no adverse consequences, he was the one who was insistent on following through. But that is the government's evidence. That's not what Mr. Lovo testified to. Yes, but Mr. Lovo—the only additional testimony in this counterfactual scenario, Your Honor, is phone calls whose content is speculative, almost all of which preceded these relevant events. We would submit that that doesn't come close to establishing a reasonable probability of acquittal on an entrapment theory. So the jury was presented with Mr. Lovo and the government's conflicting accounts of what actually happened at those meetings, and they made their assessment of which testimony they credited. And so, in order to show a reasonable probability of acquittal, the appellants would need to establish that what they've proffered here would have changed that assessment, a reasonable probability that the jury would reach the opposite conclusion. We would submit that given the nature of the evidence presented here, which is, again, almost entirely speculative, and what little we know about it runs counter to the idea that it was part of a pressure campaign, it doesn't meet that threshold. Now, Mr. Ashutu—I'm really not pronouncing his name correctly—was convicted of the Hobbs Act robbery, but was not convicted of the 924 count. Am I correct on that? That's correct. And the evidence with respect to him was that, I guess, he was obviously there on the day of the, you know, alleged robbery. But I guess here's what I'm getting at, is that Strickland says we're supposed to look at prejudice by kind of looking at the totality of the evidence, and it depends case to case, and, you know, the deficient performance and the evidence that wasn't presented that should have been presented or that was admitted and should have been kept out, you know, it's going to just depend in every case on, like, how prejudicial it was or how much impact it may have had, so there's no kind of black-and-white way of assessing these things, and that we're also supposed to look at the strengths and weaknesses of the government's case when we assign prejudice. So, the fact that Chetou is acquitted of a count when he's right there with everybody else, and he arrived in the same car with everybody else that had all the weapons in it that the government found, doesn't that say something about the weakness of the government's case? So, in terms of the actual claims raised here on Appeal, Your Honor, I would submit no, because, especially with Mr. Chetou, in terms of whether or not there's prejudice on whether or not he could have raised an entrapment defense. Well, no, I mean, I'm just saying, if what we're supposed to do under Strickland is just kind of weigh, like, okay, this mistake could have been a lot more prejudicial here because this was a weak government case, whereas if the case is, like, overwhelming with videotapes, DNA, fingerprints, your mom testifying against the defendant or whatever, you know, prejudice there would be a much more uphill battle. I guess all I'm saying to you is, doesn't that acquittal tell us, or shouldn't we, the conclusion that we reach from that is that this wasn't really that overwhelming of a case? And I will respond in the same way Your Honor has framed the question, which is distinguishing amongst these appellants, as in some of these claims, having somewhat different circumstances and different evidence and different, frankly, legal claims. So, with respect to the two claims that we've spent the most time talking about here, I would argue why Mr. Chetou still has not shown prejudice. And first, on the entrapment defense, I would say Mr. Chetou doesn't even get through the door on an entrapment defense because he could only raise a derivative entrapment defense, and there's been no suggestion, no proffer, no anything to indicate any specific targeting of his involvement in this case. The only evidence we have from any party is that he was present only at the invitation of Mr. Lovo, which this court has expressly held does not establish derivative entrapment. So, regardless of any other evidence affecting him, on the entrapment defense for Mr. Chetou, we said that would have been a non-starter under any scenario that's been presented. With respect to the other primary claim, the Spanish language audio, Mr. Chetou, he was, Your Honor, correctly, as Your Honor correctly points out, only present at that last meeting. That was a 40-minute meeting that was entirely captured on video. Mr. Chetou appears in that video, and when Mr. Chetou speaks in that video, he speaks in English, giving directions to the other participants as to what they're going to do when the robbery commences. Supplemental appendix, page 145, 154, 161, has testimony and evidence about Mr. Chetou giving those directions to the other robbers in English. There's no suggestion that that would have been excluded. I recognize that there was an acquittal on the 924C charge. Obviously, the government thought there was sufficient evidence. It wouldn't have proceeded on that charge if they didn't. But who knows how the jury drew that distinction, but if I were to wager a guess, it probably is the fact that he was only present at the last meeting and not the planning meetings, and the jury drew some distinction on that front. But they still convicted him of conspiracy to commit Hobbs Act robbery, and the evidence that they convicted him on would have been largely identical, especially in his case. He wasn't present at the earlier meetings where the conversations were largely in Spanish. His involvement at that last meeting was him speaking at times in English about directions to the other participants in this robbery. But he wasn't the guy, because he wasn't at the prior meetings, he wasn't the guy at the prior meetings who talked about how he preferred machetes, right? That was Mr. Soto. So if the jury thought that he was there to commit a robbery or had reached an agreement and committed an overt, sufficient overt acts to convict him of conspiracy to commit the Hobbs Act robbery, but yet they weren't convinced that sufficiently of the proof beyond a reasonable doubt to convict him of possession of any of the firearms, doesn't that tell us something about the potential weakness of the government's case overall? So I don't agree, Your Honor, but I think, at the very least, I will acknowledge that it means that the jury drew some distinction here. That's clearly the case. But in this posture, this court doesn't need to speculate as to why that distinction was  The questions presented here are with respect to any of these appellants, including Mr. whether or not he has shown a reasonable probability that he would have been acquitted based upon the claims actually raised by appellants in their motion for a new trial. And so with respect to whether or not he could have raised an entrapment defense, would that have raised a reasonable probability of acquittal? We submit clearly no. There's nothing to even get him through the door of derivative entrapment. With respect to the Spanish language audio, again, we submit no. I mean, he's captured on video at that last meeting participating in all of this, and then he gives statements and directions in English. So let me make sure I understand your argument about derivative entrapment. So let's suppose at the trial, the entrapment instruction had been given, and with respect to Mr. Lovo, the jury acquitted him. And we know from, say, a special verdict form was used, we know from, we know for, with certainty, that they acquitted him based on the entrapment instruction. But they convicted the other two. You would say that that would be a completely permissible outcome, and just because he was entitled to the instruction doesn't mean that the other two would have been entitled to the instruction. So yes is the short answer. But to elaborate, first of all, of course, the government's position is that none of them would have been entitled to these instructions. But given your Honor's hypothetical that the court believed that that threshold had been met and was giving instructions, the only type of instruction that possibly could have been given for Mr. Achetu or Mr. Soto on this record would have been a derivative entrapment instruction. And I would direct the court's attention to the Washington case that this court had in 1997, which expressly, the scenario in that case was they was investigating a potentially corrupt police officer. And there was discussions about him recruiting others to be involved in his illegal scheme. But it was all in generalized discussion about recruiting others. He recruited others. And this court held that they were not entitled to derivative entrapment as a defense, as a matter of law, if there was no evidence that the government had specifically targeted them for involvement. Because their involvement was because their friend invited them. There was no government action overbearing their will to engage in illegal activity. And there's nothing that's been proffered or presented, and certainly not in the trial record, indicating anything other than that Mr. Soto's and Mr. Achetu's involvement in this case was solely at the invitation and the behest of Mr. Lovo, which does not establish, as a matter of law, derivative entrapment defense. Do you see I'm over time? If your honors don't have further questions, we otherwise rely on our briefing and ask that the judgment of the district court be upheld. All right. Thank you. I believe that appellants, counsel, were both over time, but give each of you two minutes. Thank you, your honor. The government has stated the defense counsel could have ID'd disputed facts, but that's exactly what we needed the hearing for. The government counsel also stated there was no mention of a robbery until August, but we actually don't know the type of pressure that was given on them. And that specific robbery was not mentioned until August, but that doesn't mean that there wasn't pressure to do a robbery starting in May when they first started conversing about this. And there is some indication that there was some conversations about that. And the record was proper that there was inducement that happened before August, whatever that date was, August 13th. Yes, yes. And a lot of that has to do with the pressure from the 131 phone calls that occurred before that at the government's behest by the co-defendant, but at the government's behest. It wouldn't have happened had it not been for the government. As for the issue of the entrapment for Mr. Ashetu in particular, there's nothing in the affidavit. So you can't make a determination as to why his counsel did not pursue that because there was nothing in his counsel's affidavit on that at all. During the entire time that there were these conversations, the agent was constantly discussing a crew, which is the derivative entrapment here. They were constantly discussing, we need a crew. We need a crew. We can get people. You can get people. And that is how the derivative entrapment came about. The evidence, the way the evidence was presented was as to the Spanish language tapes was that the government could understand what was going on and they were the only ones that could understand what was going on. So everybody had to, that they could hear it. Nobody else could. And so we just had to believe what they had to say without any looking carefully at that. Deficiency and prejudice are closely connected because only once one knows the degree of the deficiency is it possible to determine the prejudice. And that's why you needed to have the hearing in order to be able to determine what the deficiency was in order to be able to determine the prejudice. And finally, I would like to say, as Judge Wilkins suggested, the prejudice, the court found that in 2017, they couldn't find prejudice and they sent it, couldn't determine if there was prejudice. And they sent it back to the trial court to determine whether there was prejudice or not. And we cannot find here now without having held a hearing because the affidavits didn't answer the questions that were sent back to them. The affidavit didn't discuss what conversations they had, whether the appellants advised, the affidavits could not possibly have discussed whether the appellants advised their counsel that the testimony was an inaccurate account of the conversations. The appellants had to be the ones that would be testifying as to that. And there was nothing showing the extent of prejudice from not objecting to the Spanish language tapes. Thank you. So we at this point would ask that you would reverse and remand. Thank you. Thank you, Your Honor. I'll try to be brief. So the phone calls were not explored on the record when my client testified at trial because the lawyer didn't know about the phone calls, didn't have the phone records. He didn't ask him about his full-time work because he didn't have those records. In terms of the inducement, July 24, 2012, there's a small transfer of drugs, my client and the snitch. February 7, 2013, another small transfer of drugs. That's when the snitch, February 7, 2013, is the first time the snitch introduces the undercover officer. You mean the cooperator? Yes, sir. The cooperator, the young man that had nothing to do with this offense and was working to try to get time off. So February 7, 2013, the young man brings into the conversation the undercover officer, February. After several months of nothing happening, the undercover reached out to my client. And Lobo's testimony is that he told him that he had recently purchased a store front of some kind, and he wanted his advice on how to remodel. And in fact, it is undisputed that the undercover at that meeting took my client to a shop at the 600 block of Florida Avenue and told him, this is my shop that I'm trying to remodel. The first meeting that the officer says they talked about the robbery was August 13, 2023, at a restaurant. That meeting was not recorded. That meeting was not recorded because the agents decided not to record it. And as with these reversing operations, they did it in hundreds of cases throughout the  This goes to the Selective Enforcement. All the defendants, 99% of the defendants were Blacks or Latinos. They brought them to this restaurant. They gave him alcohol, and conversations took place. And with respect to the entrapment defense, one of these cases, and they're identical, including these officers, was tried in the Eastern District of Virginia, and an acquittal resulted on an entrapment defense. I can submit that case. No, that's in the brief. I don't think the acquittal is in the brief. But the fact that they plied them with drugs and with alcohol at these meetings, and this other stuff, this was before the district court, and this was in the motions that were presented post-trial for a new trial. All right. We have your argument. Thank you, Your Honor. The case is submitted.
judges: Wilkins; Rao; Walker